# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ELAINE WILKINSON, CAMERON YOUNG, MONICA YOUNG, LARELIE LEUELLEN, and LISA DILL, | |
| *Plaintiffs*, | |
| v. | |
| OKLAHOMA HOUSING FINANCE AGENCY (OHFA), MICHAEL BUHL, in his official capacity as Chair of the OHFA Board of Trustees, SCOTT MCLAWS, in his official capacity as Vice Chair of the OHFA Board of Trustees, ROGER M. BEVERAGE, in his official capacity as Secretary-Treasurer of the OHFA Board of Trustees, DARIN DALBOM, in his official capacity as Member of the OHFA Board of Trustees, CLIFF MILLER, in his official capacity as Member of the OHFA Board of Trustees, JOI LOVE, in her official capacity as Resident Board Member of the OHFA Board of Trustees, DEBORAH JENKINS, in her official capacity as Executive Director of OHFA, KURT FITE, in his official capacity as Deputy Executive Director/CFO of OHFA, and VALENTHIA DOOLIN, in her official capacity as Homeownership Director of OHFA, | Civil Action No. CIV-24-1229-PRW _____ **Complaint – Class Action** **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiffs Elaine Wilkinson, Cameron Young, Monica Young, Larelie Leuellen, and Lisa Dill bring this action for damages and declaratory and injunctive relief on behalf of themselves and a Class of others who were similarly discriminated against based on the color of their skin. Plaintiffs bring this case against the following Defendants, who are responsible for carrying out an unconstitutional, race-based social agenda: Oklahoma Housing Finance Agency ("OHFA"); Michael Buhl, in his official capacity as Chair of the OHFA Board of Trustees; Scott McLaws, in his official capacity as Vice Chair of the OHFA Board of Trustees; Roger M. Beverage, in his official capacity as Secretary-Treasurer of the OHFA Board of Trustees; Darin Dalbom, in his official capacity as Member of the OHFA Board of Trustees; Joi Love, in her official capacity as Resident Board Member of the OHFA Board of Trustees; Deborah Jenkins, in her official capacity as Executive Director of OHFA; Kurt Fite, in his official capacity as Deputy Executive Director/CFO of OHFA; and Valenthia Doolin, in her official capacity as Homeownership Director of OHFA (collectively "OHFA").

OHFA has developed, marketed, and administered its Oklahoma Homeowner Assistance Fund program on the basis of race. OHFA discriminated and continues to discriminate in the provision of COVID-19 relief funds, violating Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to damages, a declaratory judgment, and injunctive relief.

## INTRODUCTION

1.      OHFA systematically discriminated against white and Asian homeowners when providing COVID-19 relief. As part of its Oklahoma Homeowner Assistance Fund program, OHFA prioritized "socially disadvantaged individuals" in everything from the development and marketing of its program to approving applications. OHFA impermissibly identified "socially disadvantaged individuals" based on their race.

2.      On the front page of its Oklahoma Homeowner Assistance Fund program website, OHFA stated that a homeowner is a socially disadvantaged individual if the home-owner is a "[m]ember of a group that has been subjected to racial or ethnic prejudice or cultural bias within American Society: African American, Hispanic/Latino, Native American, LGBTQ+." OHFA, Oklahoma Homeowner Assistance Fund, https://perma.cc/Y6VR-EQ4C. Homeowners in the listed racial groups were considered socially disadvantaged. White and Asian homeowners were not.

3.      Homeowners designated as socially disadvantaged based on their race had clear advantages under the Oklahoma Homeowner Assistance Fund program. For example, socially disadvantaged individuals could apply for relief if their income was equal to or less than 150% of the Area Median Income ("AMI"). *Id.* ("Eligible applicants [include] . . . "[h]omeowners who are at or below 100% of the Area Median Income or homeowners who are socially disadvantaged and are at or below 150% of the Area Median Income."); *id.* ("Homeowners who are socially disadvantaged may qualify if they are at or below 150% of the Area Median Income."). Homeowners whose race did not qualify them as "socially disadvantaged" could apply for the program only if their income was equal to or less than

2

100% of the AMI. Put differently, Oklahoma barred non-socially disadvantaged individuals from applying if their income was between 100% and 150% AMI but allowed racially defined socially disadvantaged individuals to apply at that income level.

4.      Because of this race-based classification, a white or Asian homeowner with household size of 3 in Oklahoma County, Oklahoma, could not apply for relief in 2023 if the homeowner's income was greater than $96,200 (100% AMI) unless he or she could otherwise qualify as socially disadvantaged, but a black or Latino homeowner with the same household size could apply with an income of up to $116,110 (150% AMI). HUD User, FY 2023 Homeowner Assistance Fund Income Limits Summary, https://perma.cc/H5YH-V8DE.

5.      This is just one of many ways in which OHFA's race-based program discriminated against white and Asian homeowners. OHFA also prioritized socially disadvantaged individuals in how it marketed its program—targeting its messaging about the program to its preferred racial groups—and in distributing funds to applicants whose income was below 100% AMI—prioritizing assistance to non-white and non-Asian homeowners.

6.      As a result of OHFA's racial discrimination, white and Asian homeowners (including Plaintiffs) who struggled with the economic consequences of the COVID-19 pandemic lost out on financial assistance they needed to pay their mortgages. For example, Plaintiff Elaine Wilkinson's online e-commerce business suffered as a result of the pandemic, causing her to experience a significant loss of income and to go into mortgage forbearance. Likewise, Monica Young lost her job as a massage therapist due to the pandemic, causing her and her husband Cameron (a disabled veteran) to experience a significant loss

of income and to go into mortgage forbearance. Plaintiff Larelie Leuellen was forced to leave her job at a manufacturing facility due to the increased risk of infection from COVID-19 due to her autoimmune condition, resulting in a significant loss of income and requiring her to enter mortgage forbearance. But when Plaintiffs Wilkinson, Cameron and Monica Young, and Leuellen applied for assistance through the Oklahoma Homeowner Assistance Fund program, OHFA denied their applications despite their eligibility for assistance. Plaintiff Lisa Dill was out of work for over two months as the public school where she was employed as a teaching assistant was closed due to the pandemic, causing her to experience a significant loss of income and have difficulty paying her mortgage. But due to OHFA's discriminatory marketing and outreach about its Oklahoma Homeowner Assistance Fund program, Plaintiff Dill never heard about the program. Plaintiffs Wilkinson, Cameron and Monica Young, Leuellen, and Dill—and many other Oklahoma homeowners like them— needlessly suffered financial hardships because of OHFA's race-based social agenda.

7.    There is no justification for OHFA's racial discrimination. OHFA could have administered its program in a race-neutral way. Instead, it discriminated against white and Asian homeowners in favor of homeowners from preferred racial groups. But COVID-19 did not discriminate. Oklahoma homeowners of all races needed assistance.

8.    OHFA's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)).

When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

9.      Plaintiffs and the Class are entitled to damages and declaratory and injunctive relief under Title VI and the Equal Protection Clause.

## JURISDICTION & VENUE

10.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.      This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Oklahoma.

12.      Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant is a resident of this District and all Defendants are residents of Oklahoma, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(c)(2) because Defendant OHFA is an entity with the capacity to sue and be sued and is subject to the Court's personal jurisdiction with respect to the civil action in question.

## PARTIES

13.      Plaintiff Elaine Wilkinson is a resident of Oklahoma.

14.      Plaintiff Cameron Young is a resident of Oklahoma.

15.      Plaintiff Monica Young is a resident of Oklahoma.

16.      Plaintiff Larelie Leuellen is a resident of Oklahoma.

17.      Plaintiff Lisa Dill is a resident of Oklahoma.

18.    Defendant Oklahoma Housing Finance Agency ("OHFA") is "an agency of the state and an Oklahoma Public Trust created pursuant to Title 60 Oklahoma Statutes 1981, Sections 176 to 180.3, inclusive, as amended and supplemented, the Oklahoma Trust Act, and other applicable statutes and laws of the State of Oklahoma." OHFA, Administrative Rules, https://perma.cc/4H73-ABZU; Okla. Admin. Code § 330:1-1-1. OHFA "was created in 1975 as a non-profit, tax-exempt entity" when the governor "approved the agency's first trust indenture" and "opened its doors" in 1976. OHFA, About Us, https://perma.cc/9BG4-CNM7. OHFA is responsible for implementing "rental, home buying, and housing development programs for Oklahomans across the state." *Id.* Oklahoma was awarded $87,0576,967 in federal HAF funds from the U.S. Treasury, and OHFA oversaw administration and distribution of those funds on behalf of Oklahoma. Specifically, OHFA developed, marketed, and administered the Oklahoma Homeowner Assistance Fund program.

19.    Defendant Michael Buhl is the Chair of the OHFA Board of Trustees. He was appointed as trustee and chair of the OHFA Board of Trustees in 2019 and reappointed in 2024. OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As the Chair of the OHFA Board of Trustees, he is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code § 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant Buhl is sued in his official capacity.

20.    Defendant Scott McLaws is the Vice Chair of the OHFA Board of Trustees. He was appointed to the OHFA Board of Trustees in 2017 and voted vice-chair in 2021.

OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As the Vice Chair of the OHFA Board of Trustees, he is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code § 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant McLaws is sued in his official capacity.

21.    Defendant Roger M. Beverage is the Secretary-Treasurer of the OHFA Board of Trustees. He was appointed to the OHFA Board of Trustees in 2021. OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As the Secretary-Treasury of the OHFA Board of Trustees, he is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code § 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant Beverage is sued in his official capacity.

22.    Defendant Darin Dalbom is a member of the OHFA Board of Trustees. He was appointed to the OHFA Board of Trustees in 2023. OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As a member of the OHFA Board of Trustees, he is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code § 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant Dalbom is sued in his official capacity.

23.    Defendant Cliff Miller is a member of the OHFA Board of Trustees. He was appointed to the OHFA Board of Trustees in 2024. OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As a member of the OHFA Board of Trustees, he is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code

§ 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant Miller is sued in his official capacity.

24.     Defendant Joi Love is the Resident Board Member of the OHFA Board of Trustees. OHFA, Board of Trustees, https://perma.cc/4PWN-QARG. As the Resident Board Member of the OHFA Board of Trustees, she is responsible for managing the affairs, business, and property of OHFA, Okla. Admin. Code § 330:1-1-2, including overseeing the implementation of the Oklahoma Homeowner Assistance Fund program. Defendant Love is sued in her official capacity.

25.     Defendant Deborah Jenkins is the Executive Director of OHFA. She was named executive director in 2017. OHFA, Meet the OHFA Leadership Team, https://perma.cc/Q4KV-YWDC. As Executive Director of OHFA, she is responsible for the operation of OHFA and the development, implementation, and administration of its programs, including the Oklahoma Homeowner Assistance Fund program. Defendant Jenkins was the "Authorized Official who signed and submitted the financial assistance agreement" for OHFA's plan submission to the U.S. Department of the Treasury for its Oklahoma Homeowner Assistance Fund program. OHFA, Resubmission of Plan, HAFP-0147-Oklahoma, at 1, https://perma.cc/46T6-LJN3 ("Resubmission of Plan"). Defendant Jenkins is sued in her official capacity.

26.     Defendant Kurt Fite is the Deputy Executive Director/CFO of OHFA. He was named Deputy Executive Director/CFO in 2017. OHFA, Meet the OHFA Leadership Team, https://perma.cc/Q4KV-YWDC. As Deputy Executive Director/CFO, he "directs the finance and information technology initiatives and assists in the overall administration of

OHFA programs," *id.*, including the Oklahoma Homeowner Assistance Fund program. Defendant Fite signed OHFA's initial plan submission to the U.S. Department of the Treasury for its Oklahoma Homeowner Assistance Fund program as the "Reporting Contact." OHFA, U.S. Dep't of the Treasury, Homeowner Assistance Fund Plan HAFP-0147, at 19 (Dec. 2021), https://perma.cc/57WQ-QAXT ("Oklahoma Plan Submission"). Defendant Fite is sued in his official capacity.

27.    Defendant Valenthia Doolin is the Homeownership Director of OHFA. She joined OHFA in 2021. OHFA, Meet the OHFA Leadership Team, https://perma.cc/Q4KV-YWDC. As Homeownership Director of OHFA, she "lead[s] the Single Family Homeownership and Homeowner Assistance Fund programs," including the Oklahoma Homeowner Assistance Fund program. *Id.* Defendant Doolin signed OHFA's initial plan submission to the U.S. Department of the Treasury for its Oklahoma Homeowner Assistance Fund program as the "Primary Contact." Oklahoma Plan Submission at 19. Defendant Doolin is sued in her official capacity.

## LEGAL FRAMEWORK

28.    Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

29.    As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause is 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) ("*Fearless Fund Mgmt.*")

(describing "race discrimination as 'subtle, pervasive, and essentially irremediable'" and noting that the burden of complying with Civil Rights statutes "pales in comparison to the interest in rooting out race discrimination in all its forms").

30.     Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

31.     Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

32.     Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

33.     Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason—"racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz*, 539 U.S. at 270). That is why, under strict scrutiny, "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state

interest." *Holman v. Vilsack*, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)); *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 926 (11th Cir. 1997) ("The essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option." (quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993))). Under strict scrutiny, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests" and, if so (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

34.     In sum, these constitutional and statutory standards require that all applicants for assistance in Oklahoma—for school admission, government contracts, or, as relevant here, government assistance—receive "an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL

3625684, at *5 (N.D. Tex. July 31, 2024) ("*Founders First Cmty.*") (quoting *SFFA*, 600 U.S. at 201-06).

## FACTUAL ALLEGATIONS

### I.    OHFA's Discriminatory Homeowner Assistance Fund Program

### A. American Rescue Plan Act's Homeowner Assistance Fund

35.    In March 2021, during the COVID-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner Assistance Fund. *See* Pub. L. No. 117- 2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

36.    The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

37.    Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' requirements. *Id.* § 9058d(d)(2).

38.    The Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, but it largely leaves states to run their own specific programs based on their own implementation plans. The Treasury initially released 10% of each state's eligible funds for states to use in implementing pilot programs. To receive the rest of the funds, states were required to submit their proposed plans to implement and administer the full program. When states submitted their plans, they requested a

specific amount of funds. The Treasury reviewed the states' plans and provided feedback and recommendations before approving the plans and distributing the remaining funds. U.S. Dep't of the Treasury, HAF Plans, https://perma.cc/SB8C-9CZV ("U.S. Dep't of the Treasury HAF Plans").

### B. U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals

39.     The Act requires states to prioritize the distribution of funds to target specific populations of homeowners.

40.     First, the Act specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income for their household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." *Id.* § 9058d(c)(2).

41.     Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

42.     The Act does not define "socially disadvantaged individuals."

43.     In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of socially disadvantaged individual, explicitly defining that term based on race and including a presumption that individuals of particular races are socially disadvantaged:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a

rebuttable presumption that the following individuals are socially disadvan-
taged: Black Americans, Hispanic Americans, Native Americans, and Asian
Americans and Pacific Islanders. In addition, an individual may be deter-
mined to be a socially disadvantaged individual in accordance with the pro-
cedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2 (Apr. 14, 2021)

(emphasis omitted), https://perma.cc/LX4H-DGZ5.

44.     A few months later, in August 2021, the Treasury issued updated guidance

redefining the term "socially disadvantaged individual." The new definition still provided

that individuals who were "member[s] of a group that has been subjected to racial or ethnic

prejudice or cultural bias within American society" were socially disadvantaged. The full

updated definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or
> own a home has been impaired due to diminished access to credit on reason-
> able terms as compared to others in comparable economic circumstances,
> based on disparities in homeownership rates in the HAF participant's juris-
> diction as documented by the U.S. Census. The impairment must stem from
> circumstances beyond their control. Indicators of impairment under this def-
> inition may include being a (1) member of a group that has been subjected to
> racial or ethnic prejudice or cultural bias within American society, (2) resi-
> dent of a majority-minority Census tract; (3) individual with limited English
> proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian
> Home Land, or (5) individual who lives in a persistent-poverty county, mean-
> ing any county that has had 20% or more of its population living in poverty
> over the past 30 years as measured by the three most recent decennial cen-
> suses. In addition, an individual may be determined to be a socially disad-
> vantaged individual in accordance with a process developed by a HAF par-
> ticipant for determining whether a homeowner is a socially disadvantaged
> individual in accordance with applicable law, which may reasonably rely on
> self-attestations.

*The Homeowner Assistance Fund in the American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/KR2Z-A4GQ (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

45.    The Treasury has used the same definition of socially disadvantaged individual in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2–3 (June 12, 2023), https://perma.cc/6JBQ-TMTH.

46.    The Treasury's guidance is not mandatory or binding on the States.

**C. Oklahoma Homeowner Assistance Fund**

47.    OHFA submitted its initial proposal for implementing its HAF plan in September 2021, and after receiving and responding to feedback from the U.S. Treasury, OHFA's final proposal was approved in December 2021. OHFA was awarded $87,056,967 in HAF funds. Oklahoma Plan Submission at 2.

48.    OHFA entitled its HAF program "Oklahoma Homeowner Assistance Fund."

49.    Under OHFA's Oklahoma Homeowner Assistance Fund program, homeowners were eligible for up to $35,000 of relief. Eligible homeowners could obtain relief in the form of past due mortgage payments (including escrow items and payments under a forbearance plan), up to six months of forward mortgage payments, and assistance with past due non-escrowed property taxes, insurance, and HOA and condominium fees. OHFA, Homeowner Assistance Fund Frequently Asked Questions, https://perma.cc/HL36-M8LG.

50.    OHFA's Oklahoma Homeowner Assistance Fund program closed to new applications on March 20, 2024. OHFA, Oklahoma Homeowner Assistance Fund,

https://perma.cc/Y6VR-EQ4C. However, OHFA is still administering the program, processing applications, and distributing the remaining federal funds.

### D. OHFA Considered Race When Developing, Marketing, and Administering Its Oklahoma Homeowner Assistance Fund Program

51.     In developing its Oklahoma Homeowner Assistance Fund program, OHFA chose to adopt the race-based definition of socially disadvantaged individuals offered in non-binding Treasury guidance.

52.     OHFA's plan submission stated that "OHFA will rely on applicant self-certification for determining whether a homeowner is socially disadvantaged as defined in the HAF guidance in order to not place additional roadblocks." Oklahoma Plan Submission at 10. In other plan documents submitted to the Treasury, OHFA quoted the revised Treasury guidance definition, including the factors of being a "member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" and being a "resident of a majority-minority Census tract." OHFA, Oklahoma Housing Finance Agency (OHFA) Homeowner Assistance Fund (HAF) Mortgage Payment Assistance Program: Term Sheet at 2-3 (Dec. 3, 2021), https://perma.cc/2S8M-YBJW ("Term Sheet"); Resubmission of Plan at 8 ("Oklahoma HAF will ask applicants to self-identify as Socially Disadvantaged according to the SDI Indicators included in the US Treasury definition with the addition of LGBTQ+ households.").

53.     On OHFA's public website, the agency listed specific racial groups whose members qualified as socially disadvantaged individuals: "Socially Disadvantaged indicators include the following: Member of a group that has been subjected to racial or ethnic

prejudice or cultural bias within American Society: African American, Hispanic/Latino, Native American, LGBTQ+." OHFA, Oklahoma Homeowner Assistance Fund, https://perma.cc/Y6VR-EQ4C. Notably absent from this definition were white or Asian homeowners.

54.    OHFA utilized its race-based definition of socially disadvantaged individuals in deciding how to develop its program, how and where to market and advertise its program, and how to prioritize granting applications and distributing program funds. In doing so, it prioritized preferred minority homeowners over white and Asian homeowners.

55.    In developing its plan, OHFA analyzed "demographic factors" of homeowners in the state, Oklahoma Plan Submission at 3, and considered data regarding "the impact of COVID 19 on socially disadvantaged populations," Resubmission of Plan at 1. Specifically, OHFA designed its plan to "target households at or equal to 100% AMI, prioritizing socially disadvantaged households," which it said was "consistent with reaching Oklahomans who are most vulnerable and experiencing the greatest evidence of housing insecurity." *Id.* at 1-2.

56.    To accomplish this, OHFA, during the "initial" development of its plan, "reached out to multiple community-based organizations and other organizations committed to the service of low-to-moderate income families for input on the most plausible ways to administer a homeowner assistance fund program and how OHFA can successfully reach targeted populations." *Id.* at 2. Those organizations included: "Metropolitan Fair Housing Council of Oklahoma, the Latino Community Development Agency, Urban League of Greater Oklahoma City, Neighborhood Housing Services of Oklahoma City, NOVAD

Consulting Reverse Mortgage Servicers, Oklahoma United Way Partner Agencies, City of Oklahoma City Neighborhood Coalition, African Methodist Episcopal Church 12th Episcopal District, Oklahoma National Baptist Convention, Oklahoma Catholic Charities and nationwide mortgage loan servicers." *Id.* The "[s]hared data" provided by these organizations "informed Oklahoma HAF Program administrators on targeted populations for service." *Id.* at 1.

57.    In marketing and advertising its program to inform Oklahoma citizens about the availability of funds and how to apply, OHFA targeted the agency's preferred racial and ethnic minorities—at the expense of white and Asian homeowners—based on its definition of socially disadvantaged individuals. OHFA's plan submission indicates that OHFA made "public communications" and undertook "community outreach efforts" to market its Oklahoma Homeowner Assistance Fund program by partnering "with organizations that primarily target" "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Oklahoma Plan Submission at 10-11.

58.    To market its program, OHFA "provide[d] culturally relevant marketing by" "[i]dentifying and cooperating with community-based and grass roots organizations within diverse communities who can continue to provide input for marketing/awareness and outreach approaches and design," and "[c]reating marketing/awareness/outreach strategies that include diverse multi-media approaches, including writing, digital communications, social media, and broadcast media." Resubmission of Plan at 8.

59.    OHFA also utilized mortgage servicers to direct outreach about the Oklahoma Homeowner Assistance Fund to individuals based on race. *Id.* at 1.

60.    OHFA took additional efforts to target individuals based on race to inform them about the Oklahoma Homeowner Assistance Fund program and to assist them with the process of applying for and receiving funds through the program.

61.    OHFA had "an intentional plan to target the identified most vulnerable home-owners," and that "targeted plan included identifying community based organizations, who serve large populations of socially disadvantaged individuals and families, providing information and materials that those organizations can use for increasing awareness about HAF, training volunteers from those organizations to assist individuals with limited internet access or capacity to complete the online application and facilitating telephone applications for individuals with limited internet access or capacity." OHFA, U.S. Dep't of the Treasury HAF Annual Report: Oklahoma – HAF AR 2022 at 3, https://perma.cc/PVW9-2VNL ("2022 Annual Report"); *see also* Resubmission of Plan at 8 ("Oklahoma HAF will outreach to Socially Disadvantaged individuals and communities by identifying and cooperating with grass roots and community-based organizations within those communities to create program awareness, train willing volunteers within these organizations to provide information on eligibility criteria, as well as help individuals to complete the online application process when necessary.").

62.    For example, in response to public comments on its plan from the African Methodist Episcopal Church 12th Episcopal District, OHFA stated that it "has identified multiple churches to request Memorandum of Understanding that includes training church volunteers on the program eligibility requirements, and online application process and collaborating to disseminate information to HAF Program eligible citizens." OHFA, U.S.

Treasury Clarifying Questions Response at 1 (Dec. 17, 2021), https://perma.cc/QR93-LX75.

63.    OHFA also planned to expand its targeting efforts to "hold[] on-site community-based application fairs where individual households will apply for HAF with guided staff assistance" and to "work[] directly with a community-based organization who is currently providing door to door information about Medicare expansion and other resources to the targeted population who will also now provide door to door information on the availability of HAF and the application process." 2022 Annual Report at 3. Upon information and belief, OHFA utilized such application fairs and door-to-door efforts to target individuals based on race.

64.    These targeted marketing and assistance efforts benefitted homeowners who were automatically considered socially disadvantaged individuals based on their race at the expense of white and Asian homeowners. OHFA specifically informed socially disadvantaged individuals about the program and assisted those individuals through the application process but did *not* do the same for white or Asian homeowners. This made it more likely that individuals deemed socially disadvantaged based on race would receive funding at the expense of white and Asian homeowners who were eligible to receive funding but to whom OHFA did not provide the same information or assistance.

65.    In reviewing and granting applications, OHFA prioritized applications based on race, prioritizing applications submitted by OHFA's preferred minority homeowners over white and Asian homeowners.

66.    The clearest example of OHFA's race-based prioritization is its explicit exclusion of certain racial groups with incomes between 100% and 150% AMI. Under OHFA's plan, all applicants with income equal to or less than 100% AMI meet OHFA's income requirements and can apply for assistance, but only "socially disadvantaged individuals" can apply for assistance if their income exceeds 100% AMI. *See* OHFA, Oklahoma Homeowner Assistance Fund, https://perma.cc/Y6VR-EQ4C ("Eligible applicants must meet all of the following criteria: . . . Homeowners who are at or below 100% of the Area Median Income or homeowners who are socially disadvantaged and are at or below 150% of the Area Median Income."); Oklahoma Plan Submission at 9 ("For individuals who identify as socially disadvantaged, OHFA will determine income eligibility for the program based on applicants with household incomes at or below the greater of 100% of the US Area Median Income (AMI) or 150% Area Median by county by household size."); Term Sheet at 1 (similar); Resubmission of Plan 7 (similar). In other words, under OHFA's plan, "[t]he *only* households with greater than 100% AMI served by Oklahoma HAF will be Socially Disadvantaged Households and the income limit for those households will not exceed 150% AMI." Oklahoma Plan Submission at 8 (emphasis added).

67.    Therefore, in 2023, white or Asian homeowners with a household size of 3 in Oklahoma County, Oklahoma, for example, could not apply for relief if their income was greater than $96,200 (100% AMI) unless they could meet one of the other socially disadvantaged individual factors (like having limited English proficiency or living in a persistent poverty county), but black or Latino homeowners with the same household size could automatically apply with an income of up to $116,110 (150% AMI). HUD User, FY

21

2023 Homeowner Assistance Fund Income Limits Summary, https://perma.cc/H5YH-V8DE. In sum, a black, Latino, or Native American applicant with income between 100% and 150% AMI can apply for assistance, but a similarly situated white or Asian applicant in that same income range who is not otherwise socially disadvantaged cannot.

68.     OHFA advertised this race-based income restriction on the front page of its website for the Oklahoma Homeowner Assistance Fund program and in its social media marketing, making clear to white and Asian homeowners that they need not apply if they fell within the income range of 100% to 150% AMI unless they could show they were otherwise socially disadvantaged based on another factor beyond their race. OHFA, Oklahoma Homeowner Assistance Fund, https://perma.cc/Y6VR-EQ4C; OHFA, Homeowner Assistance Fund Frequently Asked Questions, https://perma.cc/HL36-M8LG; OHFA, Facebook (June 27, 2022), attached as Exhibit 1 (listing factors for "eligible applicants," including "Homeowners at or below 100% of the Area Median Income, or . . . Homeowners who are socially disadvantaged and are at or below 150% of the Area Median Income."); OHFA, Facebook (Aug. 24, 2022), attached as Exhibit 2 (same).

69.     OHFA also prioritized socially disadvantaged individuals with incomes below 100% AMI. This prioritization included preference in granting and denying applications and distribution of funds—*i.e.*, applications submitted by black, Latino, and Native American homeowners were given priority over applications submitted by white and Asian homeowners. OHFA required all applicants to select their race in completing and submitting an application. It then used applicants' race to determine whether they should be prioritized for assistance as socially disadvantaged individuals.

70. OHFA also tracked the progress of its program by "disaggregat[ing] metrics by income, race, and gender." Resubmission of Plan at 9. OHFA also contracted with a third-party vendor, Neighborly Software, to assist with the "online process for application, prioritization, file review, communication, and tracking." *Id.*

71. In its public announcements, OHFA touted the number of approved applicants who were socially disadvantaged. OHFA, Homeowner Assistance Application Portal Closes March 20 (Feb. 20, 2024), https://perma.cc/UX27-RZ6R.

72. OHFA's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. *Out of the approved applications, 26% of homeowners were black, 13% were Native American, 1% were Asian or Pacific Islander, and 60% were white.* Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q1, 2024, https://perma.cc/ZM8X-LK93. But those statistics are do not reflect the population of Oklahoma, where about 7.9% of citizens are black, 9.5% of citizens are Native American, 2.9% of citizens are Asian or Pacific Islander, and 73% of citizens are white. U.S. Census Bureau, Quick Facts: Oklahoma, https://perma.cc/6PGK-FSXL. This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about 17.9% of Oklahoma citizens below the poverty line are black and 13.7% are Native American while about 68.3% are white and 2.6% are Asian or Pacific Islander. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/SL9W-46X8.

## II.    Effect of OHFA's Racial Discrimination on Plaintiffs

73.    Because of OHFA's race-based implementation of its Oklahoma Homeowner Assistance Fund program, Plaintiffs were deprived of the opportunity to learn about the program and apply for assistance, were deterred from applying for assistance, or were denied assistance after applying because of their race.

### A.  Plaintiff Elaine Wilkinson

74.    Plaintiff Elaine Wilkinson is a resident of Oklahoma.

75.    Plaintiff Wilkinson is white.

76.    Plaintiff Wilkinson owns a home in Cleveland County, Oklahoma, and has a mortgage on the home.

77.    Plaintiff Wilkinson is an artist and has an online e-commerce business through which she sells her personalized and handcrafted items.

78.    In the wake of the COVID-19 pandemic, Plaintiff Wilkinson's international vendor that assists with printing and mailing her personalized and handcrafted items to customers was temporarily shut down due a COVID-19 quarantine. As a result, she was temporarily unable to fulfill orders to her customers, and through no fault of her own, her online e-commerce account was suspended. These events related to the COVID-19 pandemic caused Plaintiff Wilkinson to experience a significant decrease in income.

79.    Plaintiff Wilkinson also experienced a significant increase in housing and living expenses after the start of the COVID-19 pandemic.

80.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Wilkinson struggled to pay her bills, including her mortgage.

81.    For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Wilkinson was forced to enter a period of mortgage forbearance.

82.    Plaintiff Wilkinson applied for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program while the program was still accepting applications.

83.    Plaintiff Wilkinson was eligible for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program because she met its income limits and other requirements.

84.    Plaintiff Wilkinson applied for relief under the program, but OHFA denied her application.

85.    Upon information and belief, OHFA's denial of Plaintiff Wilkinson's application was due to OHFA's race-based criteria, including its prioritization of applications and distribution of funds.

86.    Upon information and belief, Plaintiff Wilkinson would have received financial assistance had OHFA not discriminated based on race.

87.    Because Plaintiff Wilkinson's application was denied, she was unable to obtain financial assistance for her mortgage, including assistance related to her mortgage forbearance.

88.    Therefore, Plaintiff Wilkinson was harmed and continues to be harmed by OHFA's racial discrimination.

**B.  Plaintiffs Cameron and Monica Young**

89.    Plaintiffs Cameron and Monica Young are residents of Oklahoma.

90.     Plaintiffs Cameron and Monica Young are white.

91.     Plaintiffs Cameron and Monica Young own a home in Cleveland County, Oklahoma, and have a mortgage on the home.

92.     Plaintiff Cameron Young is a disabled veteran.

93.     Prior to the COVID-19 pandemic, Plaintiff Monica Young worked as a massage therapist for a chiropractor's office.

94.     After the COVID-19 pandemic started, Plaintiff Monica Young lost her job as a massage therapist. Initially, she was temporarily laid off due to the pandemic and, subsequently, the chiropractor's office ended its massage therapy program due to difficulties from the pandemic. These events related to the COVID-19 pandemic caused Plaintiffs Cameron and Monica Young to experience a significant decrease in income.

95.     Due to this financial hardship related to the COVID-19 pandemic, Plaintiffs Cameron and Monica Young struggled to pay their bills, including their mortgage.

96.     For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiffs Cameron and Monica Young were forced to enter a period of mortgage forbearance.

97.     Plaintiffs Cameron and Monica Young applied for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program while the program was still accepting applications.

98.     Plaintiffs Cameron and Monica Young were eligible for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program because they met its income limits and other requirements.

99.    Plaintiffs Cameron and Monica Young applied for relief under the program, but OHFA denied their application.

100.    Upon information and belief, OHFA's denial of Plaintiffs Cameron and Monica Young's application was due to OHFA's race-based decisions, including its prioritization of applications and distribution of funds.

101.    Upon information and belief, Plaintiffs Cameron and Monica Young would have received financial assistance had OHFA not discriminated based on race.

102.    Because Plaintiffs Cameron and Monica Young's application was denied, they were unable to obtain financial assistance for their mortgage, including assistance related to their mortgage forbearance.

103.    Therefore, Plaintiffs Cameron and Monica Young were harmed and continue to be harmed by OHFA's racial discrimination.

**C.    Plaintiff Larelie Leuellen**

104.    Plaintiff Larelie Leuellen is a resident of Oklahoma.

105.    Plaintiff Leuellen is white.

106.    Plaintiff Leuellen owns a home in Tulsa County, Oklahoma, and has a mortgage on the home.

107.    Before the COVID-19 pandemic, Plaintiff Leuellen worked for a manufacturing facility.

108.    After the COVID-19 pandemic began, Plaintiff Leuellen was forced to leave her job at the manufacturing facility due to her increased risk of serious infection from

COVID-19 because of her autoimmune condition. The loss of her job due to the COVID-19 pandemic caused Plaintiff Leuellen to experience a significant decrease in income.

109.    Due to this financial hardship related to the COVID-19 pandemic, Plaintiff Leuellen struggled to pay her bills, including her mortgage.

110.    For example, as a result of the financial hardships related to the COVID-19 pandemic, Plaintiff Leuellen was forced to enter a period of mortgage forbearance.

111.    Plaintiff Leuellen applied for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program while the program was still accepting applications.

112.    Plaintiff Leuellen was eligible for financial assistance through OHFA's Oklahoma Homeowner Assistance Fund program because she met its income limits and other requirements.

113.    Plaintiff Leuellen applied for relief under the program, but OHFA denied her application.

114.    Upon information and belief, OHFA's denial of Plaintiff Leuellen application was due to OHFA's race-based criteria, including its prioritization of applications and distribution of funds.

115.    Upon information and belief, Plaintiff Leuellen would have received financial assistance had OHFA not discriminated based on race.

116.    Because Plaintiff Leuellen's application was denied, she was unable to obtain financial assistance for her mortgage, including assistance related to her mortgage forbearance.

117.    Therefore, Plaintiff Leuellen was harmed and continues to be harmed by OHFA's racial discrimination.

### D.    Plaintiff Lisa Dill

118.    Plaintiff Lisa Dill is a resident of Oklahoma.

119.    Plaintiff Dill is white.

120.    Plaintiff Dill owns a home in Tulsa County, Oklahoma, and has a home loan on her property.

121.    Plaintiff Dill works for the public school system in Tulsa, Oklahoma.

122.    At the time of the COVID-19 pandemic, Plaintiff Dill was working as a teaching assistant at her school.

123.    After the COVID-19 pandemic started, the school where Plaintiff Dill worked was shut down to in person classes for over two months. As a result of this shut-down caused by the pandemic, Plaintiff Dill lost a significant amount of income.

124.    Even after the school reopened, Plaintiff Dill was forced to miss additional time due to being infected with COVID-19, causing her to lose income.

125.    Plaintiff Dill also experienced a significant increase in housing-related expenses in caring for her three children as a result of the COVID-19 pandemic.

126.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Dill struggled to pay her bills, including her mortgage.

127.    Due to OHFA's discriminatory targeting, marketing, and outreach regarding its Oklahoma Homeowner Assistance Fund program, Plaintiff Dill never heard about the program.

128.    Because Plaintiff Dill never heard about the program as a result of OHFA's discriminatory targeting, marketing, and outreach, she was unable to apply for and obtain financial assistance for which she plainly qualified—including assistance related to her mortgage payments—before the program closed to new applications in March 2024.

129.    Therefore, Plaintiff Dill was harmed and continues to be harmed by OHFA's discrimination.

130.    Plaintiff Dill was ready and able to apply for relief through OHFA's Oklahoma Homeowner Assistance Fund program.

131.    Had Plaintiff Dill been informed about the program by OHFA, she would have applied for and been eligible for assistance. If OHFA had not discriminated on the basis of race in administering the program, Plaintiff Dill would have received much-needed COVID-19 relief.

## CLASS ALLEGATIONS

132.    Plaintiffs bring this action on behalf of themselves and other Oklahoma homeowners similarly entitled to relief.

133.    The Class here consists of:

    a.    All Oklahoma homeowners who applied for assistance under OHFA's Oklahoma Homeowner Assistance Fund program, who are white or Asian, who were otherwise eligible for funds under the program but did not meet OHFA's definition of socially disadvantaged individual, and who had their applications denied or delayed in processing by OHFA because of OHFA's race-based prioritizing of applications.

    b.    All Oklahoma homeowners who are white or Asian, who were otherwise eligible for funds under OHFA's Oklahoma Homeowner Assistance Fund program but did not meet OHFA's definition of socially disadvantaged individual, and who never learned about the program because of OHFA's race-based marketing and outreach.

134.    Class members are seeking damages from OHFA under Title VI for unlawful discrimination in the development, marketing, and administration of the Oklahoma Homeowner Assistance Fund program.

135.    Class members are also seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Oklahoma Homeowner Assistance Fund unlawful and requiring OHFA to stop administering the program in a racially discriminatory manner.

136.    In the alternative, Class members are seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Oklahoma Homeowner Assistance Fund unlawful, requiring OHFA to stop administering the program in a racially discriminatory manner, and requiring OHFA to reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

137.    The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class

shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

138.    The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Oklahoma and the thousands of homeowners who applied for the Oklahoma Homeowner Assistance Fund program, there are at least thousands of members of the proposed Class.

139.    Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

   a.    Whether OHFA defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

   b.    Whether OHFA intentionally targeted non-white and non-Asian homeowners in its Oklahoma Homeowner Assistance Fund marketing;

   c.    Whether OHFA intentionally prioritized non-white and non-Asian homeowners in its review of Homeowner Assistance Fund applications;

   d.    Whether OHFA discriminated against Class members on the basis of their race;

   e.    Whether OHFA's challenged conduct violates Title VI; and

   f.    Whether OHFA's challenged conduct violates the Equal Protection Clause.

140.    Plaintiffs' claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Oklahoma homeowners, who were eligible for funds under the Oklahoma Homeowner Assistance Fund program, are white or Asian and otherwise did not meet OHFA's definition of socially disadvantaged individuals, and who either (i) applied for the program and were denied funds or had the processing of their application delayed, (ii) were not permitted to apply for the program because of their race, or (iii) never learned of the program in the first place because of their race. They were therefore similarly affected by OHFA's wrongful conduct complained of herein.

141.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiffs have no interests adverse or antagonistic to the Class.

142.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage servicer information, and publicly available data. Class-wide damages can also be readily calculated based on the information available in OHFA's Oklahoma Homeowner Assistance Fund program. Prosecution as a class action will eliminate the possibility of

unnecessary, repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the COVID-19 pandemic.

143.    The Class is also certifiable under Federal Rule of Civil Procedure 23(b)(2). OHFA has discriminated and continues to discriminate on grounds that apply generally to the Class—namely, prioritizing applications and marketing the Oklahoma Homeowner Assistance Fund program based on race. Therefore, declaratory and injunctive relief declaring that OHFA's development, marketing, and implementation of its Oklahoma Homeowner Assistance Fund program is unlawful and requiring OHFA to stop administering the program in a racially discriminatory manner in the distribution of any remaining funds, or, in the alternative, to reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN PRIORITIZATION OF APPLICATIONS

144.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

145.   **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

146.   This provision of Title VI may be enforced through suits by private individuals for damages and injunctive relief. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

147.   "The two elements for establishing a cause of action pursuant to Title VI are (1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance." *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993); *Alexander*, 532 U.S. at 280.

148.   Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

149.   "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring); *see Founders First Cmty.*, 2024 WL 3625684 at *3-4 (holding that plaintiff's

discrimination claim pursuant to 42 U.S.C. § 1981 likely to succeed on the merits because program "discriminates against applicants . . . based on race").

150.    But, at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

151.    **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

152.    Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is never a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted). Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes

disadvantages upon persons . . . who bear no responsibility for whatever harm the benefi-ciaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past discrimination" is not a compelling interest because it "provides no guidance for [the government] to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

153.    Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

154.    If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—mean-ing 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207; *Holman*, 2021 WL 2877915, at *5. To be narrowly tailored, a racial classification must be "sufficiently fo-cused" on obtaining "measurable objectives warranting the use of race." *SFFA*, 600 U.S. at 230. This means that it must be targeted—*i.e.*, it cannot be over- or under-inclusive. *See id.* at 216; *see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *SFFA*, 600 U.S. at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

155. **OHFA's Use of Race in Prioritizing Applications Fails Strict Scrutiny.**
OHFA received federal financial assistance from the HAF program and intentionally used those federal funds to prioritize granting applications and distributing funds to homeowners in preferred racial and ethnic groups over white and Asian homeowners through its Oklahoma Homeowner Assistance Fund program.

156. OHFA used the term "socially disadvantaged individual" as a proxy for black, Native American, and Latino homeowners, and prioritized applications submitted by those "socially disadvantaged individuals" over white and Asian homeowners.

157. The clearest example of OHFA's racial discrimination is its bar on white and Asian homeowners with annual household income between 100% and 150% AMI from applying unless those homeowners could meet one of the other socially disadvantaged individual factors (such a living in a persistent poverty county or having limited English proficiency) while black, Native American, and Latino homeowners could apply within that income-range because OHFA's program deemed them to be automatically socially disadvantaged. *See Founders First Cmty.*, 2024 WL 3625684, at *3 (enjoining grant-applicant program under 42 U.S.C. § 1981 where program "insisted that applicants must belong to one of its preferred demographic groups"). That race-based barrier to applying for relief alone subjects OHFA's Oklahoma Homeowner Assistance Fund program to strict scrutiny.

158. OHFA used race in prioritizing other applications based on its definition of socially disadvantaged individuals. Indeed, OHFA's application for assistance required applicants to provide their race and ethnicity before submitting the application or receiving

assistance. *See id.* at *4 (cleaned up) (holding that program application that "require[d] disclosure of race and demands demographic information . . . before [approved applicants] are selected" discriminated based on race).

159.   Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of "socially disadvantaged" applicants based on race failed strict scrutiny); *Holman*, 2021 WL 2877915, at *13–14 (holding that USDA's distribution of loan forgiveness to "socially disadvantaged" applicants based on race failed strict scrutiny); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1294 (M.D. Fla. 2021) (same); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (same); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 498 (N.D. Tex. 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny); *Strickland v. U.S. Dep't of Agric.*, 2024 WL 2886574, at *9 (N.D. Tex. June 7, 2024) (holding that USDA's Emergency Relief Program's distribution of more relief funds to "socially disadvantaged farmers" than white farmers failed strict scrutiny).

160.   And courts have recently held other race-based application programs to be unlawful under similar civil rights statutes. *See Fearless Fund Mgmt.*, 103 F.4th at 769,

777 (holding that private grant contest "open only to businesses owned by black women" unlawfully discriminated on the basis of race in violation of 42 U.S.C. § 1981); *Founders First Cmty.*, 2024 WL 3625684, at *3-4 (holding that private small business grant program that required "applicants [to] identify as . . . Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a Low or Moderate income area" unlawfully discriminated "based on race" in violation of 42 U.S.C. § 1981).

161.    Because OHFA's Oklahoma Homeowner Assistance Fund program prioritized applications based on race, strict scrutiny applies.

162.     OHFA's race-based prioritization scheme for reviewing and granting applications through its Oklahoma Homeowner Assistance Fund program fails to satisfy strict scrutiny.

163.    OHFA's use of race in prioritizing applications to socially disadvantaged individuals does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination against a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

164.    Moreover, OHFA's use of race to prioritize socially disadvantaged individuals over white and Asian homeowners does not remediate any specific, identified instances of past discrimination. Rather, the Oklahoma Homeowner Assistance Fund program is based on a generalized notion of remedying past societal discrimination: for homeowners of its preferred racial and ethnic groups, declaring homeowners socially disadvantaged individuals if they are "member[s] of a group that has been subjected to racial or

ethnic prejudice or cultural bias within American Society: African American, Hispanic/La-tino, Native American, LGBTQ+." OHFA, Oklahoma Homeowner Assistance Fund, https://perma.cc/Y6VR-EQ4C. In other words, the program is not targeted toward some specific episode of past, intentional discrimination that OHFA participated in.

165.    Even if OHFA could show a compelling interest in its race-based Oklahoma Homeowner Assistance Fund program, the program is not narrowly tailored.

166.    *First*, OHFA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing applications according to a race-based definition of socially disadvantaged individuals.

167.    For example, Texas used race-neutral criteria to determine which homeown-ers are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those home-owners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11 (Jan. 27, 2022), https://perma.cc/4985-5GH8 ("Texas HAF Plan").

168.    California, too, used race-neutral criteria to prioritize aid. California "de-fine[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulner-ability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 10-11 (Dec. 9, 2021), https://perma.cc/G3L7-2KMB ("California HAF Plan"). As defined by the U.S. Department of Housing and Urban De-velopment, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50

percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/7QK7-CJCX ("HUD, Qualified Census Tracts and Difficult Development Areas"). As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/D8NJ-SUT8 ("UCLA, California COVID-19 Owner Vulnerability").

169.    OHFA could have also defined socially disadvantaged individual status based on other race-neutral factors such as geographic location, family size, risk of eviction, mortgage debt, or countless others and used those factors to prioritize applications. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

170.    *Second*, OHFA's prioritizing applications for socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are disadvantaged while white and Asian homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. And in the

context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. That is especially true for white and Asian homeowners in Oklahoma with annual household income between 100% and 150% AMI, who are entirely barred from assistance unless they can qualify as socially disadvantaged based on some other indicator. State-preferred minority homeowners in that income range, however, can apply for assistance. Moreover, OHFA's program has "finite resources," which means that any prioritization makes a big difference—applicants who qualify as socially disadvantaged individuals based on their race have earlier and easier access to funds than applicants who do not meet the racial criteria, and applicants at the back of the line risk having crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 721 F. Supp. 3d at 493 ("[T]he fact that the latter applicants have a backdoor to benefits doesn't change the initial disadvantage conferred by the stereotype."); *see SFFA*, 600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

171.    *Third*, OHFA's Oklahoma Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing homeowners' applications based on race—prioritizing a minority applicant who lost his job due to supply chain issues caused by the COVID-19 pandemic and has trouble making mortgage payments due to the loss of income has nothing to do with remediating past discrimination. In any event, the program is underinclusive—the program excludes both minority homeowners who do not fall within its

income limits and those white and Asian Americans who have experienced discrimination. The program is also underinclusive in that it prioritizes assistance to certain preferred minority racial and ethnic groups, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363*; Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. It is also overinclusive—it prioritizes applications submitted by non-white and non-Asian homeowners regardless of whether those homeowners or their specific racial group have experienced housing discrimination. Moreover, the income limits for applicants with annual household income between 100% and 150% AMI are arbitrary—drawing explicit racial lines for who can apply for assistance in that income range does nothing to remedy past discrimination.

172.    Because OHFA's intentional use of race in prioritizing applications as a part of its Oklahoma Homeowner Assistance Fund program fails strict scrutiny, OHFA's actions violate the Equal Protection Clause and Title VI.

173.    Plaintiffs and other class members were the intended beneficiaries of the federal program receiving assistance—namely, eligible homeowners entitled to receive funds through the Oklahoma Homeowner Assistance Fund program.

174.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of OHFA's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all Oklahoma Homeowner Assistance Fund funds that they have been wrongfully deprived of because of their race.

175.    Plaintiffs and other Class members are also entitled to nominal damages for OHFA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

176.    Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that OHFA's Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring OHFA to stop administering the program in a racially discriminatory manner.

177.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that OHFA's Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring OHFA to reopen the program and reconsider denied applications on a race-neutral basis.

178.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## COUNT II
## 42 U.S.C. § 2000d & 42 U.S.C. § 1983
## RACIAL DISCRIMINATION IN MARKETING AND OUTREACH

179.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

180.    OHFA received federal financial assistance from the federal HAF program and intentionally used those federal funds to market its Oklahoma Homeowner Assistance Fund program to state-preferred minority homeowners at the expense of white and Asian homeowners.

181.    OHFA used the term "socially disadvantaged individual" as a proxy for black, Native American, and Latino homeowners, and it developed and implemented an outreach and marketing program to advertise its Oklahoma Homeowner Assistance Fund

program to homeowners in those preferred racial and ethnic groups. White and Asian homeowners were not targeted for outreach or marketing as part of OHFA's marketing plan.

182.   Many eligible white and Asian homeowners—like Plaintiff Dill—thus had no idea they could obtain the significant financial assistance the Oklahoma Homeowner Assistance Fund program offered. Had eligible white and Asian homeowners like Plaintiff Dill known about the program, they would have applied and obtained substantial financial assistance.

183.   Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364; *Holman*, 2021 WL 2877915, at \*13–14; *Wynn*, 545 F. Supp. 3d at 1294; *Faust*, 519 F. Supp. 3d at 478; *Nuziard*, 721 F. Supp. 3d at 498; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774; *Strickland v*, 2024 WL 2886574, at \*9; *cf. Fearless Fund Mgmt.*, 103 F.4th at 769, 777; *Founders First Cmty.*, 2024 WL 3625684, at \*3-4.

184.   Because OHFA's Oklahoma Homeowner Assistance Fund program chose to market and conduct other outreach efforts to homeowners based on race, strict scrutiny applies.

185.   OHFA's race-based marketing plan for advertising and informing homeowners about its Oklahoma Homeowner Assistance Fund program fails to satisfy strict scrutiny.

186.    OHFA's use of race in deciding how and to whom to market its program does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination to a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

187.    Moreover, OHFA's use of race to market its program to homeowners in preferred racial and ethnic groups over white and Asian homeowners does not remediate any specific, identified instances of past discrimination.

188.    Even if OHFA could show a compelling interest in its race-based Oklahoma Homeowner Assistance Fund program, the program is not narrowly tailored.

189.    *First*, OHFA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without marketing their programs to special racial minority groups rather than all eligible homeowners.

190.    For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and targeted marketing and outreach to those homeowners. Texas HAF Plan at 11.

191.    California, too, used race-neutral criteria to target outreach about aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and targeted marketing and outreach to those homeowners. California HAF Plan at 11. As

47

defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." HUD, Qualified Census Tracts and Difficult Development Areas. As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA, California COVID-19 Owner Vulnerability.

192.    OHFA could have marketed its program equally across the state, ensuring that all eligible homeowners had equal opportunity to learn about the available financial assistance. OHFA also could have targeted its marketing to specific areas or specific homeowners based on race-neutral factors like income, poverty level, family size, eviction rates, mortgage delinquencies, etc. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

193.    *Second*, OHFA's marketing to socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are disadvantaged while white and Asian homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. In other words, OHFA decided it was more important that homeowners of certain preferred racial groups hear about the

program rather than homeowners who are members of disfavored races. And in the context of marketing a program that distributes federal benefits, marketing to some homeowners but not others "necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. OHFA's program had "finite resources," which means that marketing makes a big difference—homeowners deemed socially disadvantaged individuals based on their race have earlier and easier opportunity to learn about the program (and apply for funds) than homeowners who do not meet the racial criteria, and applicants who do not hear about the program (or hear about it too late) risk having these crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 721 F. Supp. 3d at 493; *see SFFA*, 600 U.S. at 219.

194.    *Third*, OHFA's Oklahoma Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by marketing the program to certain homeowners but not others based on race. For one, it is underinclusive—the program excludes minority homeowners who do not fall within its income limits and white and Asian American homeowners who do fall within its income limits even if those white homeowners experienced discrimination. And to the extent OHFA marketed to certain geographic areas but not others based on race, that too is underinclusive because it ignores minority homeowners in other non-targeted geographic areas. The program is also underinclusive in that it prioritized marketing to certain preferred minority racial and ethnic groups, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. It is also

overinclusive—it markets the program to homeowners based on race, regardless of whether those homeowners or their specific racial group experienced housing discrimination and regardless of whether the homeowners are eligible for benefits under the program.

195.    Because OHFA's intentional use of race in marketing its Oklahoma Homeowner Assistance Fund program fails strict scrutiny, OHFA's actions violate the Equal Protection Clause and Title VI.

196.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of OHFA's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all Oklahoma Homeowner Assistance Fund funds that they have been wrongfully deprived of because of their race.

197.    Plaintiffs and other Class members are also entitled to nominal damages for OHFA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

198.    Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that OHFA's Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring OHFA to stop administering the program in a racially discriminatory manner.

199.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that OHFA's Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring OHFA reopen the

program, market the program on a race-neutral basis, and consider new applications on a race-neutral basis.

200.     Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Plaintiffs request relief and judgment as follows:

a. Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b. Award Plaintiffs and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c. Award Plaintiffs and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d. Declare that Defendants' racially discriminatory development, marketing, and administration of the Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner.

e. Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of the Oklahoma Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner, reopen the program, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

f. Enter judgment in favor of Plaintiffs and the Class members;

g. Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

h. Order such further relief as the Court may deem proper and just.

Dated: November 22, 2024

Respectfully submitted,

s/ Jared B. Magnuson

| | |
|---|---|
| William T. Thompson* | Jared B. Magnuson |
| Matthew H. Frederick* | Lehotsky Keller Cohn LLP |
| Lehotsky Keller Cohn LLP | 3280 Peachtree Road NE |
| 408 W. 11th Street, 5th Floor | Atlanta, GA 30305 |
| Austin, TX 78701 | (512) 693-8350 |
| (512) 693-8350 | jared@lkcfirm.com |
| will@lkcfirm.com | |
| matt@lkcfirm.com | Jonathan F. Cohn* |
| | Lehotsky Keller Cohn LLP |
| Mark M. Rothrock* | 200 Massachusetts Avenue, NW, Suite 700 |
| Lehotsky Keller Cohn LLP | Washington, DC 20001 |
| 8513 Caldbeck Drive | (512) 693-8350 |
| Raleigh, NC 27615 | jon@lkcfirm.com |
| (336) 416-3326 | |
| mark@lkcfirm.com | |

*Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiffs*